UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

BAYBERRY LAKES HOMEOWNERS
ASSOCIATION, INC., a Florida corporation;
et al., as individuals, on behalf of themselves and all
others similarly situated,

      Plaintiffs,

v.                           CASE NO.: 6:18-cv-00072-GKS-GJK

GERALD BOENEMAN, an individual;
GEORGE GLANCE, III, an individual;
MICHAEL HOLDER, an individual; KB HOME
GOLD COAST, LLC, a foreign limited liability
company; KB HOME JACKSONVILLE, LLC, a
foreign limited liability company; KB HOME
ORLANDO, LLC, a foreign limited liability
company; and JOSHUA SPALTEN, an
individual.,

      Defendants.
_____/

## DEFENDANTS' MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF FELIX MARTIN AND LEGAL MEMORANDUM IN SUPPORT

Plaintiffs in this putative class action bought single-family homes built by one of the corporate Defendants in the Bayberry Lakes development. They seek to offer expert testimony by engineer Felix Martin, based on testing at only some of the homes, that the stucco on all 276 such homes was defectively installed, principally because there was only one coat of stucco, that as a result all the homes suffer excessive cracking, and all the stucco must be replaced, for which they seek damages of approximately $11 million.

Martin's opinions, however, do not come close to satisfying controlling standards for admissibility, including Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), and must be excluded. Although Martin protests that he employed the "scientific method,"

his approach is the opposite of scientific and the opposite of reliable.  It hinges on Martin acting as a conduit for key opinions reached by *other* supposedly expert individuals not identified as experts in this case, opinions which themselves are disputed and not shown to be reliable.  Martin further relies on undocumented observations, vague, undefined standards, and tests performed only on homes selected by Plaintiffs' counsel and only at locations where Martin believed he would find problems.  He also relies on circular, *post-hoc* reasoning, and inapplicable standards and protocols that he failed to follow in any event.

As a result, Defendants move the Court to exclude from evidence in connection with class certification or otherwise any material in Martin's report or any testimony by Martin regarding the following:

(1) Plaintiffs' principle alleged "common" stucco installation defect, that is, the number of stucco layers or coats at the Bayberry Lakes homes, addressed by personnel at Deberry Engineering Associates, Inc. ("DEA"), who have not been identified as expert witnesses in this case, and any reference to results of laboratory testing of stucco samples by DEA;

(2) any opinions that replacement of all stucco on all Bayberry Lakes homes is an appropriate repair to remedy purported issues with the stucco installation, which is necessarily based on the inadmissible DEA conclusions regarding the number of stucco layers on the homes;

(3) the existence of alleged stucco installation defects on any Bayberry Lakes home other than those Martin personally subjected to detailed inspection and testing; and

(4) the existence of a causal relationship between any claimed stucco installation defect and any alleged "damage."

The grounds for this motion are more fully set forth in the memorandum of law below.

## MEMORANDUM OF LAW

### A.   INTRODUCTION AND FACTUAL BACKGROUND

#### 1.   This Action

83 individuals who own 57 homes within the Bayberry Lakes subdivision have sued three KB Home ("KB") entities and one current and three former KB employees in a putative class action for damages for alleged stucco installation deficiencies on the exterior walls of their homes. Plaintiffs seek to allege and prove installation deficiencies and resulting damage — principally stucco applied in an insufficient number of coats — for each of their 57 individual homes and thereby allege and prove the same defects and resulting damage on *all* of the other 219 other homes. Doc. 20 ¶¶ 37-38.

#### 2.   Background on Bayberry Lakes Construction and Exterior Stucco Systems

Before turning to the opinions of Plaintiffs' expert Martin, some basic information on the installation of exterior stucco systems at Bayberry Lakes will be helpful.

Bayberry Lakes includes 338 individual, single family homes. Ex. U at 30.[1]  KB built 276 of these homes at various times over a 7 year period, the stucco being manually installed by crews of individual laborers for three different stucco subcontractors. Ex. N. at 21-23; Ex. X. at 2; Ex. G at 2-5.

Of these 276 homes, 193 are one story and 83 are two story.  The exterior first story walls on all homes consist of concrete masonry over which stucco, a cement plaster coating, is applied directly and then painted.  Ex. X at 2.  On the two story homes, the second story exterior walls include the wood frame and plywood sheathing, over which is placed a weather protective barrier.  Paper backed lath, which consists of a paper backing to which a metal mesh is attached,

---

[1] Defendants have filed the Declaration of James Michael Walls in support of this motion and in support of their Response in Opposition to Plaintiffs' Motion for Class Certification.  Exhibits attached to that Declaration are designated herein as "Ex." followed by the appropriate letter.

is stapled to the wood frame through the weather protective barrier, and the stucco plaster is applied to the lath.  Ex. X at 2; Ex. N at 23-24.  The stucco is then painted.

### 3.   Overview of Martin's Methodology and Opinions

Martin is an engineer who originally did structural design work but has done only "forensic" work since 1996 when he reorganized into Marcon Forensics.  Ex. N at 28-29.  80% of his work is in Florida and 80% of that Florida work is for the Plaintiffs' law firm.  *Id.* at 355. Martin has never worked for a production home builder like KB, nor supervised such construction.  *Id.* at 92.  He has never personally installed stucco.  *Id.* at 26-27.

Martin performed what he called an "engineering assessment" of the 276 KB homes at Bayberry Lakes.  Ex. AA at 3, 23.[2]  He concludes that the stucco on all 276 homes was defectively installed and that as a result all the stucco must be replaced.  *Id.* at 25-26.

Martin's self-proclaimed "scientific method" for carrying out his assessment began with a visual inspection of all 276 homes, from which he determined they had "excessive" cracking (although he admits some homes had no visible cracking), but he neither took photographs nor made any other record of his observations at the 219 homes he did not test, made no count and took no measurements of the cracks, and cannot provide any meaningful definition of what is "excessive."  *Id.* at 4, 7; Ex. N at 18-19, 32-33, 39-45, 47-48, 127; Ex. Q.[3]

This "excessive" cracking on all the houses, he "hypothesized," was due to unspecified "improper installation" of the stucco.  He admits, however, that even properly installed stucco will crack.  Ex. N at 36-37, 157, 171.  But he claims this initial "hypothesis" was supported by

---

[2] Martin's initial report stated that there were only 266 homes, but he admitted that was an error and the report should have stated there were 276 homes.  Ex. N at 31.

[3] Martin explained that "excessive cracking" was "like [the definition for] pornography, you know it when you see it." Ex. N at 43-44.

the fact that the cracking he saw was, in his view, not due to possible alternative causes, such as shrinkage or settlement issues.  Ex. AA at 17, 19.

Martin next purported to "test" that "hypothesis" by a more detailed examination of 57 homes that Plaintiffs' counsel chose for him (54 of which belonged to the Plaintiffs) and by "destructive" testing, i.e. "cuts" made into the stucco walls, of only 52 of those.  Ex. N at 29, 66-67.  Personnel from an independent contractor he hired (but not Martin himself) also conducted a "tap test" which involved striking a hammer or other object against the wall to listen for differences in sound that indicated debonding of the stucco.  *Id.* at 49, 95-99.  No records were kept of the homes where this test was performed, the locations on the homes, or the "tap test" results.  *Id.* at 97-98.  No other testing was conducted by Martin.  He performed no tests for leaks or water tests, and he never went inside a single Bayberry Lakes home.  *Id.* at 32-33, 45, 47-49, 113, 116-18, 129.

The same personnel (again, not Martin) took stucco samples from the destructive testing "cuts," predominately at one location (below the corner of the window) from each home, one sample per home from a masonry wall and for the homes with two stories, primarily one to two samples from the second story.  Ex. AA at 11-12; Ex. N at 349-50.[4]

Martin says there were a number of problems in these samples, although he admits not all of the problems appeared in each location sampled.  Ex. AA at 8; Ex. N at 146, 153-54.  Specifically, Martin identified the following as defects he found in the one and two story homes: (1) insufficient number of stucco coats, (2) insufficiently long staples, (3) lack of gap and proper

---

[4] Martin took 98 samples or "cuts" from 53 homes; 1 sample from 31 homes; 3 samples from 20 homes; and 4 samples from 2 homes.  Of these 98 "cuts," 79 were located at the window.  In fact, all 53 "cuts" from the first story were taken at the window and over half (26 of 45 "cuts") at the second story were taken at a window.  Only 5 were taken in the field of the stucco wall.  Ex. J at 8.  Yet Martin opines there is defective stucco installation throughout all surfaces and locations not only at each of the homes he examined and took samples from, but also at the other 219 that he did not examine.

sealing at windows, (4) allegedly improper reverse lapping of the weather protective barrier, (5) improper lapping of paperback lath, (6) inadequate stucco thickness, (7) inadequate stucco hydration, (7) poor embedment of stucco plaster in the lath, (8) debonding of stucco from the lath and (9) lack of control joints.  Ex. N at 151-54.

For purposes of class certification, Plaintiffs rely on only three of these defects as being common to the KB Bayberry Lakes homes and requiring a global replacement of stucco:  the insufficient number of stucco coats, improper window seals, and insufficiently long staples. Doc. 131 at 3.

But on the critical issue of the number of stucco coats, neither Martin nor his company actually tested the stucco, took any measurements, or reached or recorded any conclusions — the actual determination was outsourced to another company, DEA, whose employees have not been identified as expert witnesses, and who submitted no Rule 26 report.  Ex. AA at 8-9, 20; Ex. N at 101-03, 107, 110, 210-11, 230-32.  DEA concluded that there "appeared to be" issues with the number of stucco layers and recorded "approximate" hydration of the stucco samples based on "estimated" material contents, as well as its thickness in some but not all samples from undisclosed sample locations.  *See* Ex. AA at 8-9, 20-21; Ex. O.[5]  Martin's Report parroted DEA's conclusions, but he admitted the work and conclusions were DEA's, not his own.  Ex. N at 102, 107, 110, 210-11, 230-32.  Martin did not supervise DEA's work, nor did he verify or validate DEA's work or conclusions, and he admittedly outsourced the analysis to DEA because they were in a better position to do it than he was.  *Id.* at 101-10, 210-11, 213-14, 230-37, 349-50.

---

[5] Although Martin made the DEA analysis Appendix M to his Report, Plaintiffs did not offer it in support of their Motion for Class Certification.  Defendants have filed DEA's cover letter and relevant forms used by DEA for each stucco sample examined.  *See* Ex. O.

Based on his observations of "excessive" cracking in 276 homes, and his finding of various problems with the stucco installation in just 52 of the homes he tested, he concluded by extrapolation that the damage — "excessive" cracking — in *all* 276 homes was caused by "improper installation" of stucco at all those homes, including those he did not inspect or test in detail.  He further concludes that the only viable remedy is replacement of all the stucco on all surfaces of all of the homes.

**B.      GOVERNING LEGAL PRINCIPLES**

**1.      Expert Testimony Must Be Reliable.**

Opinion testimony is not admissible simply because it proceeds from the mouth of a "qualified" expert.  It must also be shown that the expert's methodology is sufficiently reliable, that the facts on which the expert relies are sufficient, and that the expert has reliably applied the methodology to those facts.  Fed. R. Evid. 702; *Allison v. McGhan Med.*, 184 F.3d 1300, 1309 (11th Cir. 1999).

**2.      The Proponent of Expert Testimony Bears the Burden of Proving its Reliability, and the Court's Inquiry Should Be "Exacting."**

In areas where Martin admitted a lack of knowledge, Martin or Plaintiffs' counsel has argued that the Defendants' experts can do further investigation if they wish.  It is therefore critical to keep in mind that it is not Defendants' burden to show the lack of reliability and inadmissibility of Martin's opinions, nor is it Defendants' job to try to fill in gaps in Martin's work.  Instead, as the Eleventh Circuit has held, "[t]he burden of laying the proper foundation for the admission of [] expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence."  *Allison*, 184 F.3d at 1306; *Chapman v. Proctor & Gamble Distributing, LLC*, 766 F.3d 1296, 1304 (11th Cir. 2014); *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005).

The court must "conduct an *exacting* analysis of the proffered expert's methodology," *McCorvey v. Baxter Healthcare Corp.,* 298 F.3d 1253, 1258 (11th Cir. 2002) (emphasis supplied), to ensure that the jury is not exposed to unreliable expert testimony, which can assume "talismanic significance" in the eyes of lay jurors. *United States v. Frazier*, 387 F.3d 1244, 1260, 1263 (11th Cir. 2004) (en banc); *Allison*, 184 F.3d at 1310 (juries are more likely than a judge to be "awestruck by the expert's mystique"). The reliability of an expert's methodology must be scrutinized at *each* step of the analysis, and a lack of reliability at any step renders the testimony inadmissible. *McClain v. Metabolife Int'l, Inc.,* 401 F.3d 1233, 1245 (11th Cir. 2005).

Factors relevant to the "exacting" analysis include (1) whether the expert's technique or theory can be or has been tested, or instead reflects a subjective, untestable approach, (2) whether it has been subjected to peer review and published, (3) its known or potential error rate, and (4) its general acceptance in the relevant scientific community. Additional factors include whether the expert has failed to adequately account for alternative explanations, unjustifiably extrapolated from premises to unfounded conclusions, relied on "experience" with no showing how specific experience allows him or her to reach reliable conclusions, and whether "analytical gaps" in the expert's testimony render it unreliable. *See generally Daubert*, 509 U.S. at 593-95; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Frazier,* 387 F.3d at 1262; Fed. R. Evid. 702, Advisory Comm. Notes, 2000 amendments.

### C.    The Principles Applied to Martin's Testimony

Martin seeks to opine that all the KB homes at Bayberry Lakes had stucco applied in an insufficient number of coats. He then further opines that all these homes suffered damages in the form of cracking that is "excessive."[6] Based on those two opinions, he further concludes that the

---

[6] The only "damage" Martin suggests apart from the excessive cracking is purported staining by water of the underlying wood sheathing, but he admits he did not find this everywhere, and in all events, he admitted that

insufficient coats — throughout all surfaces on all homes — is the cause of the cracking, the only damage alleged to be present on all homes, Ex. N at 155, and that the only viable repair is complete replacement of all the stucco.[7]

As we now show, breaking down Martin's analysis into its various steps, and applying the "exacting" scrutiny required by Rule 702 and *Daubert*, Martin's approach is the very opposite of scientific and reliable, and his opinions must be excluded.

### 1.      Parroting Unreliable Conclusions of Non-Testifying Experts

#### a.      Experts may not simply act as conduits for the opinions of others.

The critical issue alleged by Plaintiffs to be common is the existence of stucco applied in only one coat, rather than the required two or three coats. On this key point, however, and other related points, such as the extent of hydration in the stucco, Martin has no expert opinion of his own to offer, but simply parrots the conclusions of DEA, which has neither been identified as an expert nor submitted a Rule 26 expert report.

Fed. R. Evid. 702 and 703 allow experts to rely on some types of information not admissible in court,[8] but courts routinely reject as inadmissible expert testimony like this that

---

whether this even constitutes "damage" is a subjective point. Ex. N at 141-43.

[7] Plaintiffs also assert as a purported common defect that the staples securing the lath to the frame were insufficiently long. This could only be an issue, however, on the second stories of the two-story homes, which constitute a minority of the homes at Bayberry Lakes. Moreover, for all the reasons set forth herein, Martin cannot validly extrapolate from findings as to the sample homes to reach conclusions on the other homes not sampled. Furthermore, KB's experts concluded the staples do not appear to have impacted the stucco's performance, a point that Martin does not attempt to rebut. *See* Ex. I at 17; Ex. N at 155. Martin pointed to "bubbling" of stucco purportedly shown on photographs that were not included in his Report, but admitted he did not observe this in his own visual inspection and offered without any testing or investigation the suggestion that the purported damage had been repaired. Ex. N at 338-39, 343. Plaintiffs also point to the allegedly improper window seals, but that issue, if valid, would not, by Martin's own admission, require a global replacement of stucco, but merely repairs at individual windows. Ex. N at 192, 195.

[8] Information does not become admissible as substantive evidence simply because an expert relies on it. Fed. R. Evid. 703, Advisory Comm. Note, 2000 amendment. To the extent a testifying expert's opinions are intertwined with and depend on the truth of evidence that is inadmissible for substantive purposes, those opinions must likewise be excluded. See, e.g., *United States v. Batchelor-Robjohns*, 2005 WL 1761429, *5-6 (S.D. Fla. June 3, 2005). Thus because Martin's other opinions —  such as the allegedly insufficient stucco coats at the homes not tested, causation, resulting damage, and the need to repair — rely on DEA, they must be excluded.

simply regurgitates the opinions of another expert and makes the testifying expert in effect the mouthpiece or spokesperson for the out-of-court witness. *See, e.g.*, *Am. Key Corp v. Cole Nat'l Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985) (expert opinions ordinarily cannot be based on the opinions of others, whether the others are in evidence or not).[9] Such testimony constitutes an impermissible end-run around the hearsay rule, and in many cases, including this one, the out-of-court expert's conclusions have not themselves been validated or shown to be reliable.

In *In re James Wilson Assoc.*, 965 F.2d 160, 172-73 (7th Cir. 1992) (Posner, J.), for example, the creditor presented expert testimony by an architect regarding the value of a building securing its loan, which included as a key component opinions on the condition of the building. *Id.* at 165, 171-72. But the architect's testimony was based on information related to him on the building's condition building by a consulting engineer. *Id.* The bankruptcy judge excluded the architect's testimony as hearsay, and the district court affirmed. *Id.*

On appeal, the Seventh Circuit agreed. *Id.* at 172-73. As the Court explained, an expert may rely on information as to which the expert has no firsthand knowledge, and which may or may not itself be admissible. But the testifying expert may not be used "as a vehicle for circumventing the rules of evidence." *Id.* Thus, a "hand-off" in which the testifying expert becomes the spokesperson for the out-of-court expert is impermissible. As Judge Posner explained, "The issue was the state of the building, and the expert who had evaluated that state — the consulting engineer — was the one who should have testified. *Id.* at 173; *see also Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005) (It is impermissible for "a witness, under the guise of giving expert testimony, to in effect become the

---

[9] Numerous other decisions have also rejected this type of second-hand expert testimony. *See, e.g.*, *Mamani v. Sanchez Berzain*, 2018 WL 1090546, *3-5 (S.D. Fla. Feb. 28, 2018); *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1363-65 (S.D. Fla. 2009); *Batchelor-Robjohns*, 2005 WL 1761429, at *5; *Dura Automotive Sys. v. CTS Corp.*, 285 F.3d 609, 612-16 (7th Cir. 2002).

mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion").

Similarly, in *United States v. SCA Services of Ind., Inc.*, 1995 WL 569634, *7-9 (N.D. Ind. Aug. 15, 1995), the issue was whether a hardware distributor (HWI) had contributed hazardous waste to a CERCLA site. *Id.* at *3-4. The parties suing HWI offered an expert affidavit stating that a "sweeping compound" taken to the site from HWI's facility contained toxic chemicals, based on a report from a laboratory to whom the expert sent samples for analysis. *Id.* at *4-7. HWI argued that this testimony was inadmissible hearsay, and that having failed to designate personnel from the lab as expert witnesses, the other parties should not be able to submit results from the lab indirectly, through the mouth of the testifying expert. *Id.* at *7-8.

The district court agreed and ordered the expert's affidavit stricken. Citing *James Wilson Assoc.*, the court held that the proponents of the testimony were impermissibly seeking to have the testifying expert act as the laboratory's spokesman regarding the chemicals in the sweeping compound. *Id.* at *9. As in *James Wilson*, "[t]he expert who evaluated the sweeping compound, rather than Meyers [the testifying expert], should have testified as to its constituents. Meyers, in his supplemental affidavit, is merely vouching for the truth of what Geo told him: the sweeping compound that Geo tested contained xylene." *Id.*

Finally, in *Hutson v. Covidien Holding, Inc.*, 2015 WL 4040447, *1-4 (S.D. Ohio June 30, 2015), the court excluded expert testimony on the cause of injury to a patient's gums, where the expert, a "clinical engineer," regurgitated and "concurred with" the findings of metallurgists regarding a needle used in a root canal procedure. *Id.* at 1-2. The metallurgists, however, were not themselves offered as expert witnesses. *Id.* at 4. The testifying engineer did not observe or

conduct the tests himself, was not qualified to interpret the findings of the metallurgists, and offered no explanation how he questioned or verified the metallurgists' data. *Id*.

The court concluded that the plaintiff had failed to demonstrate how the testifying expert had reasonably relied on the metallurgists. *Id*.; *see also Scott v. City of Chicago,* 724 F. Supp. 917, 922-23 (N.D. Ill. 2010) (expert in one field cannot base opinion on report of expert in another field on matter which the testifying expert is not qualified to verify, where the soundness of the underlying expert judgment was in issue); *Deutz Corp. v. City Light & Power, Inc.*, 2009 WL 2986415, *4-6 (N.D. Ga. Mar. 21, 2009) (expert did not independently confirm results of reports and was not involved in the analysis contained in them, but just took them at face value); *Mamani*, 2018 WL 1090546, at *4-5 (excluding testimony where expert failed to verify in any meaningful way the inadmissible opinions of other expert, on which he based his own, citing *Deutz, supra*).

### b.      Martin simply parrots or channels DEA's out-of-court opinions.

The same problems of admissibility and reliability inhere in Martin's wholesale reliance on the DEA conclusions, and the same result — exclusion of the testimony — should follow.  As in the cases discussed above, Martin did not actually perform the testing or assessment of the stucco samples to reach a conclusion on the number of coats, thickness, and composition/hydration of the stucco plaster.  That was all done by DEA.  Thus, it should have been DEA who provided sworn testimony as an expert witness.  That is particularly the case since, as in *Hutson*, the testifying expert, Martin, did not verify and could not explain DEA's data, methods or conclusions.

Martin could not answer even basic questions regarding the DEA analysis that are critical to his "one-coat" stucco installation defect theory.  He could not, for example, explain why

DEA's report appeared to refer to samples taken from the window jambs or sills, when according to Martin he instructed his contractors to take samples from the vertical faces under the windows. Ex. N. at 236-37.  This is critical because stucco plaster at the window sills is only required to be applied in one coat.  *Id.* at 189-90; Ex. K at 39; Ex. H. at App. 9, p. 3, Table 1.  Accordingly, to the extent DEA's observations pertained to stucco at the window sills, it would not be curious or represent a Code violation for the plaster to be installed in one coat.

As another critical example for Martin's "one coat" stucco theory, DEA's report states at various points that there "does not appear to be" a second coat and "does not appear to be a color coat."  When asked whether this reflected DEA's subjective assessment, Martin first responded with an unequivocal "Yes," but then he asked to "back up," and said, "I don't – I don't know exactly what DEA's specific methodology of using this statement does not [sic] appear to be . . . ."  Ex. N at 231.[10]  DEA's report also refers to testing samples at "approximately" three locations, and Martin could not explain what "approximately" could possibly mean in that context.  *Id.* at 106-07.

DEA's report contains other mysteries as well. DEA makes an assumption regarding sand aggregate weight as part of its analysis of the composition of the stucco plaster.  Martin does not know the origin or basis for that assumption.  *Id.* at 105-06.  Where DEA describes lath corrosion, Martin does not know what method or terms or scale DEA is using to reach this conclusion.  *Id.* at 230-32.  He cannot explain how DEA could refer to lath found on first floor structures, when those were stucco over masonry, rather than lath.  *Id.* at 234.

---

[10] Some DEA forms actually reference samples containing more than one coat, contrary to Martin's theory, but for every DEA sample form where the number of coats is questioned by DEA the same subjective phrase, "does not appear to be," is used for the second or third coat —  regardless of whether the sample was from the first story where only two coats were required or from the second story where three coats were required.  *See* Ex. O (DEA App. M sample forms); Ex. N at 230-32.

c.      **DEA's disputed analysis has not been shown to be reliable.**

DEA did not merely provide undisputed data or perform ministerial work to gather information for Martin to use in formulating his opinion.  The issue of the number of stucco layers is a hotly disputed, substantive issue. As Martin admits, the DEA results "go to the root of the problem" and the testing results were a key part of his so-called "scientific method."  *Id.* at 103-04.  And on this key point, it was DEA that provided the analysis and conclusions, with no verification by Martin.

In addition, DEA's methods and conclusions have not been shown to be reliable, as required for admissibility.  To the contrary, there are substantial grounds to doubt their reliability.  DEA repeatedly refers to the samples as not "appearing" to have a second or third coat.  This qualification is particularly significant given that stucco may be installed in a way — the so called "double back" method — that makes it difficult to see multiple layers.  Defendants' experts testified that this in fact appeared to be the case with the stucco at Bayberry Lakes, based on the stucco thickness and telltale bubbles appearing in it.  *See* Ex. L at 73, 78-80, 107-08, 128-29; Ex. K at 48, 51, 53-56; Ex. H, Table 8. This evidence calls DEA's conclusions into question, but is not even addressed by DEA, nor can Martin explain what DEA meant by its reference to the "appearance," or even what their methodology was for arriving at that conclusion.  Ex. N at 231.

Defendants' expert engineer, Brice Miller, found multiple other problems and factual errors in the DEA analysis.  *See* Ex. H at 20-23.  These include references to all first story homes having one coat when in fact DEA itself concluded four samples had two coats (and Miller further observed the required second coat in 40 of the 52 samples from the first story, and more than one coat in some of the second story samples, based on observed, entrapped air between

coats in the sample), *id.* at 29-30, missing samples, photographs that were not correctly matched to the designated samples, and lack of sample orientation to determine, for example, whether the part of the sample DEA was observing was from the *vertical* jamb section where two coats were required or from the horizontal sill section where only one coat was required.

Miller also notes that ASTM C856 on which DEA relied states that there is no generally accepted method for assessing hydration and that, in fact, it is a "qualitative" determination. *Id.* at 31. Martin admits that DEA's hydrology conclusions represent a "qualitative" assessment, but he does not know what it means. Ex. N. at 213-14. This is significant because Martin opines that the DEA results showing a variation in hydration levels signal the existence of an insufficient number of stucco coats. *See* Ex. N at 208-12. But, as Miller points out, variations were not reported within samples, but rather *between* different samples. As such, they reflect differing hydration levels not because of any issues with the number of coats, but because the stucco was applied at different locations (including different homes) and times, and exposed to different climatic conditions. Ex. K at 110-13, 160-62.

In sum, substantial questions exist regarding the reliability of DEA's methodology and conclusions, and it is totally improper for Martin to simply rely on it wholesale, acting as a spokesman for DEA's out-of-court opinions. As in *James Wilson* and numerous other cases on the same point, the opinions of Martin that simply regurgitate the unreliable DEA findings must be excluded. The Court should therefore exclude any evidence of those findings, whether from the DEA report itself or from Martin acting as a conduit for DEA. [11]

---

[11] Plaintiffs cannot argue Martin's opinions on stucco layers and other matters in the DEA analysis somehow represent his own observations and conclusions. His Report states that prior to testing he had only "hypotheses," not conclusions, he attended no testing and personally observed no samples, sending them to DEA, who admittedly were better equipped to reach an actual "determination," and he further admitted that the conclusions on stucco layers and other alleged problems were DEA's, not his. Ex. AA at 8, 9, 20; Ex. N at 101-03, 107, 110, 210-211, 230-32, 349-350.

2.     **Subjective, Unrecorded Observations of "Excessive Cracking"**

A second linchpin of Martin's opinions on causation, damage and the need for global replacement of all stucco on all homes, is the existence of "damage" in the form of "excessive" cracking in all 276 KB homes in Bayberry Lakes. Ex. N at 151.  Martin, however, could offer nothing but his admittedly subjective opinion as to what constitutes "excessive" cracking.  As he put it, like pornography, "you know it when you see it," and indeed, "[o]nce you notice it, it becomes excessive."  *Id.* at 43-44.  Consistent with this purely subjective approach, he took no photographs of the cracks he observed throughout the development in the more than 200 homes he failed to inspect in detail, nor did he count or measure cracks in any of the homes.  *Id.* at 45.[12]

The scientific method, however, is based on documented, objective measurements, not subjective opinions.  As the district court in *Open Text S.A. v. Box, Inc.*, 2015 WL 349197 (N.D. Cal. Jan. 23, 2015), held, an expert's "experience" is not visible to the court or jury or testable by cross examination, but amounts to "a black box into which data is fed at one end and from which an answer emerges at the other."  As the court pointedly observed, "Cross-examination cannot fix that problem."  *Id.* at \*6; *see also Joiner*, 522 U.S. at 146 ("[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Lee-Bolton v. Koppers, Inc.*, 319 F.R.D. 346,

---

[12] Plaintiffs' counsel discussed in Martin's deposition a previously undisclosed internet article by Jeff Bowlsby, chair of the ASTM stucco committee, offering a definition of "excessive cracking."  *See* Ex. N at 315-18. Defendants' counsel objected, *id.*, and this material cannot save Martin's opinion.  Because not timely disclosed, it cannot be used now.  *See* Fed. R. Civ. P. 37(c)(1).  Nor does research done only after the conclusion has been reached render an expert opinion reliable.  To the contrary, this is the "antithesis" of the scientific method.  *E.g.*, *PODS Enterp., Inc. v. U–Haul Int'l, Inc.*, 2014 WL 12628664, at \*4 (M.D. Fla. June 27, 2014).  The material is not from an authoritative source, amounts to the author's unreliable, inadmissible, hearsay personal opinion, and itself acknowledges there is no accepted definition of "excessive" cracking.  The "definition" it offers turns not on any objective characteristics of cracks, but on whether the stucco was properly installed.  Martin would effectively be arguing here: (1) I can tell there must be stucco defects causing this cracking because it is excessive, and (2) I know it is "excessive" because I have found defects in the stucco application.  This is circular.

377-78 (N.D. Fla. 2017) (citing *Open Text* and rejecting the admissibility of "black box" testimony as unreliable).

Indeed, reliance on subjective, "Trust me, I know it when I see it," opinions is the opposite of a reliable, scientific approach.   As the court observed in *Pretter v. Metro N. Commuter R. Co*, 206 F. Supp. 2d 601, 604 (S.D.N.Y.  2008), "[o]ne who seeks to clothe his opinions in the garb of 'scientific certainty' must adhere to the strict standards of objectivity that that formal wear entails," and reliance on subjective "data" is "palpably problematic" in that regard.  *Id.*

In fact, the focus by *Daubert* and Rule 702 on whether the expert's technique or theory can be or has been tested goes to this very issue:  "whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability."   Fed. R. Evid. 702, Advisory Committee Notes, 2000 amendments. Martin's critical finding of "excessive" cracking throughout the development involves precisely the sort of undocumented, subjective and conclusory approach that *Daubert* rejects.

### 3.    Circular, *Post-Hoc* Testimony on Causation that Fails to Rule Out Other Causes.

As just shown, Martin's testimony on the supposed existence of inadequate stucco coats on all the homes, and his opinion on the existence of "damage" on all the homes, are both unreliable and inadmissible.  The fundamental flaws in these two points logically doom Martin's further opinion based on them that the "damage" on all the homes is caused by inadequate coats of stucco, and that all stucco must therefore be replaced.

But all of Martin's common causation and consequent repair opinions independently fail the *Daubert* standard for another reason as well: expert causation testimony is unreliable where

the expert has not adequately accounted for obvious alternative explanations.  *See* Fed. R. Evid. 702, Advisory Comm. Notes, 2000 amendments (citing *Claar v. Burlington N.R. Co.*, 29 F.3d 499 (9th Cir. 1994)); *see also, e.g.*, *Guinn v. AstraZeneca Pharmaceuticals, LP*, 602 F.3d 1245, 1253 (11th Cir. 2010) (expert opinion properly excluded where causation expert failed to rule out other possible causes); *Haller v. AstraZeneca Pharmaceuticals, LP*, 598 F. Supp. 2d 1271, 1298-99 (M.D. Fla. 2009) (same).

Martin's opinion that the common defects in the stucco are the cause of "excessive" cracking throughout the entire development fails this key test of reliability, for two reasons.

**First**, Martin's own opinions on the existence of *other* alleged *non-common* defects themselves demonstrate that his development-wide causation opinion must be excluded.  As discussed above, Martin identified at least nine different alleged defects in the "sample" of homes he examined in detail.  For purposes of class certification, however, Plaintiffs point to only three of these defects as being common to all KB homes – specifically, the number of coats, the window seals, and the staples.

Thus, even assuming there is "excessive" cracking in all of the homes, Martin did nothing to eliminate one or more of the other *non-common* defects as the cause of the alleged "damage" for any given home.  Accordingly, his opinion as to the existence of common defects and causation, and the concomitant need for a global repair consisting of replacement of all the stucco on all the homes, is unreliable and inadmissible.  The existence of defects and their contribution, if any, to the claimed damage can only be assessed on a home-by-home basis.

This is precisely the same problem that required exclusion of similar expert testimony at the class certification stage in *Gazzara v. Pulte Home Corp.*, 2017 WL 840953 (M.D. Fla. Mar. 3, 2017), another putative class action involving claimed stucco construction defects.  In

*Gazzara*, the plaintiffs alleged that the stucco on their houses violated the Florida Building Code, and sought to certify a class of persons owning Pulte homes with stucco siding over the past 10 years. Their expert sought to opine that two purportedly common stucco defects were present in, and caused damage to, all the relevant homes, based on an examination of sample homes in which the defects were found. *Id.* at *4-7. As here, the plaintiffs contended that "damage and causation is common throughout the class" and that replacement of the stucco was the common remedy. *Id.* at *1.

The expert's causation theory — just like Martin's here — was that if defects are present, then they were the cause of the cracking. The expert's own report, however, also like Martin's, asserted that there were *other* potential defects identified in the homes he tested, but not alleged to be common, that could have caused the claimed "damage" (cracking). *Id.* at *8-9. Yet, also like Martin here, he did nothing to rule out the other potential causes of the claimed damage throughout all homes. *Id.* at *8. He performed no tests, nor did he point to any test that could be performed, to determine if a particular crack was caused by one of the specified violations, by some other violation, or by a factor that did not constitute a Code violation. The expert simply pointed to his "education, training, and experience." As Judge Presnell observed, however, "[r]ather than merely asserting that he has a great deal of experience, Miller is obligated to 'connect the dots' between that experience and his conclusions" regarding causation and damages. *Id.* at *9.[13]

Accordingly, even if the expert's causation methodology had adequate support in general as to individual homes that were examined, it could not produce a reliable conclusion that the

---

[13] Plaintiffs' expert in *Gazzara* was Thomas Miller; Defendants' expert in this case is Brice Miller with the firm Hoy & Miller.

owners of all the homes had suffered the same injury as required at the class action stage.  *Id.*
Instead, "[e]ach home must be considered individually."  *Id.*

The same is true here.  Martin similarly admitted that without testing he could not
determine the cause of a particular crack, Ex. N at 43, and yet he performed no tests to
demonstrate that the cracks he observed in the homes he tested, much less the 219 homes he did
not test, in fact resulted from the alleged common Code violations as opposed to other alleged
defects that are *not* common to all the homes.

**Second**, Martin also admits, just as did the expert in *Gazzara*, that even properly installed
stucco can suffer cracking, from such factors as expansion and contraction and settlement of the
foundation.  Ex. N at 36-37; *Gazzara*, 2017 WL 840953 at \*8-9.  Yet Martin has no adequate
explanation why some or all of the existing cracking is not due to one or more of these other
potential causes as well.

His attempt to support his opinion that all the cracking in all the stucco must be caused by
defects because it is "excessive" fails because, as shown above, his opinions in that regard lack
any objective, testable content.  His argument that the control joints installed in the second
stories would eliminate all "normal" cracking is totally unsupported by anything other than
Martin's own say so or *ipse dixit*.  Ex. N at 40-43.

Martin claimed he could somehow tell the cracks were not due to settlement or
foundation issues, but he took no measurements nor conducted any other detailed examinations
to test this, relying instead on his "oodles" (his word) of engineering experience, including the
examination of buildings after an earthquake (a condition not alleged to exist here).  *Id.* at 157-
61.  Under *Daubert*, however, an expert relying on experience must be able to explain precisely
how the expert's specific experience allows him or her to reach a reliable conclusion on the facts

of the case. *Gazzara*, 2017 WL 840953 at *9; *Frazier,* 387 F.3d at 1262.  Martin totally fails to do that.

In short, Martin's approach is to "hypothesize" that any cracking is caused by a stucco deficiency, and to "test" that hypothesis, he samples a very limited set of locations on only 52 of the 276 homes at issue, and if he finds a deficiency, he concludes without further testing or measurements or anything else that the deficiency, and not some other cause, must be responsible for the cracks, not only in the particular homes he tested, but everywhere in the development.

This is classic circular, or *post hoc ergo propter hoc*, reasoning, it is "a bit like saying that if a person has a scratchy throat, runny nose, and a nasty cough, that person has a cold; if, on the other hand, that person has a scratchy throat, runny nose, nasty cough, and wears a watch, they have a watch-induced cold." *Bushore v. Dow Corning-Wright Corp.*, 1999 WL 1116920, at *6 (M.D. Fla. Nov. 15, 1999) (citation omitted).  Martin's opinions on defects and causation throughout the development amount to the same thing.  If there are cracks, and no defects, those would be normal cracks, which can be expected. If there are cracks, but there are defects, then those must be "defect-induced" cracks.  *Post-hoc* reasoning like this is unreliable and conclusions based on it inadmissible.

### 4. Additional Flaws in Martin's Methodology

#### a. Martin relied on biased, unreliable sampling.

Martin's Report represents that his conclusions are supported by a "valid and reliable representative sampling of the residences' components and appurtenances."  Ex. AA at 27.  To the contrary, Martin's selection of homes for testing, from which he extrapolates to the 219 other, non-tested homes, further underscores the total lack of reliability in his method.

21

As Defendants' expert statistician Jamie Baldwin, Ph.D, explained, regardless whether the overarching substantive area involved is engineering or another discipline, the reliability of an attempt to extrapolate from particular samples to conclusions regarding a larger population is inherently subject to a statistical analysis. Ex. M at 115-16. Statistically reliable methods would have to be used to support such conclusions, including the use of random sampling to ensure the samples were representative. *Id.* at 12-15, 51, 54, 97, 116.

Martin, however, did not do that. In fact, he did not select them at all; they were selected for him by Plaintiffs' counsel, and almost all of them consisted of homes owned by the Plaintiffs themselves. Ex. N at 29, 66-67. As pointed out by Dr. Baldwin, this is not a valid, reliable or unbiased sample. The homes of those who actually joined in filing a lawsuit alleging stucco defects and damages very well might reveal problems greater in extent or degree than others who did not join in the suit. Ex. J at 6. It therefore cannot support valid conclusions regarding defects throughout the development.

Indeed, despite the inherently statistical nature of his opinion, Martin disclaimed any attempt to reach statistically valid conclusions, choosing instead to rely on his "engineering judgment." Ex. N at 80-81, 84-86, 92-95. But this "judgment," like his "black box" opinions on "excessive cracking," is not reliable because it is not subject to being tested in any objective way. Nor did Martin do anything to ensure the sample was representative, such as taking into account the different stucco subcontractors who did the installation, the years of construction, or the locations of the homes. *See* Ex. M at 113.

This lack of reliability is exacerbated by Martin's choice of specific locations to test on the homes that he did examine. Even though his opinions purport to address the conditions in all exterior wall locations on all 276 homes, the samples he tested were drawn almost exclusively

from areas below the corners of windows where he observed cracks and thought that there could be problems.  Ex. N at 34-35, 70-73.

This approach, as Dr. Baldwin observed, injects bias into the analysis and precludes drawing any valid conclusions as to all wall surfaces, much less as to other homes not tested. Ex. M at 99.  As she points out, even the ASTM standard on which Martin purports to rely (discussed in more detail in the next section) provides that the condition of both performing and non-performing areas of stucco should be examined in reaching conclusions.  Ex. J at 7-10; Ex. P at §§ 5.4, 9.5.1.  Martin did not attempt to do that.

### b. Martin relied on an inapplicable ASTM standard that he did not follow in any event.

Faced with these fundamental flaws, Martin seeks to borrow reliability for his approach by arguing that he followed a published, standard approach, set forth in ASTM E2128, which, he says, does not require random sampling to allow him to extrapolate from his limited findings to the entire development.  *See* Ex. N at 78-81, 86-89, 262; Ex. P.  That standard, however, does not remotely support the reliability of Martin's methods or his conclusions, for multiple reasons.

**First**, as Martin admits, the ASTM standard is intended to be used in determining the cause of known or suspected leaks or water intrusion.  Ex N at 252, 265.  But that necessarily means it is *not* a standard for determining *whether* water intrusion exists and is causing *cracks*, nor whether installation defects exist and are causing cracks.  The standard itself — Ex. P — repeatedly makes this clear.  Section 1.1, for example, states, "This guide describes methods for *determining and evaluating causes of water leakage* of exterior walls."  *See also* § 4.1 ("[t]he starting premise for the application of this guide is that the building is suspected or known to leak").

**Second**, Martin argues that ASTM E2128 allows him reach conclusions as to houses other than the ones he actually inspected and tested without any kind of random sampling.  Ex. N at 328-29.  But that is simply not the case.  While the standard does not rely on random sampling, it expressly states that this is because the standard's premise "is that *the building* is suspected or known to leak."  Thus, the standard by its own nature and terms applies to inspection and testing to find the cause of leaks *in a particular building*, not to extrapolating to other buildings that have not been tested or examined pursuant to the protocol.

**Third**, Martin failed to follow important aspects of the protocol set forth in the standard.  Section 9.7, for example, emphasizes the importance of documenting steps that are taken in the investigation.  Yet Martin failed to document various steps in his "scientific" process, including in particular the existence of "excessive" cracking throughout all 276 homes in the development, of which he made no record.  Ex. N at 32-33, 45, 47-48, *see also id.* at 95-99 (conceding that he made no record of the results of the alleged "tap test").  He has no photographs documenting "leaks."  *Id.* at 112.  He admits he did not do a complete service and maintenance history or interview occupants or others or inspect the interior as required by section 8.1.  *Id.* at 32-33, 45, 47-48, 113, 116-18, 129. He failed to perform testing to recreate water pathways, directed by section 10.1 as the "primary" purpose of the protocol it describes.  *Id.* at 128.

**Finally**, Martin argues that ASTM E2128 merely offers a "smorgasbord" of possible choices of steps to take, that he need not follow any particular directive, and that he may simply use his "engineering judgment."  *Id.* at 263-64.  But Martin cannot have it both ways.  To the extent he relies on his "judgment" to dispense with steps the standard provides, it necessarily renders his attempt to borrow reliability and objectivity by relying on the standard totally empty.

## CONCLUSION

For all the foregoing reasons, Defendants' motion to exclude the expert report and testimony of plaintiffs' expert Felix Martin should be granted.

Respectfully submitted,

/s/ *James Michael Walls*
James Michael Walls
Florida Bar No. 706272
Lannie D. Hough, Jr.
Florida Bar No. 149470
Katherine L. Heckert
Florida Bar No. 85038
Brian C. Porter
Florida Bar No. 0120282
CARLTON FIELDS JORDEN BURT, P.A.
4221 W. Boy Scout Boulevard
Tampa, FL 33607-5780
Telephone: (813) 223-7000
Facsimile: (813) 229-4133
lhough@carltonfields.com
mwalls@carltonfields.com
kheckert@carltonfields.com
jcostello@carltonfields.com
cmoody@carltonfields.com
bporter@carltonfields.com
*Attorneys for Defendants*

## LOCAL RULE 3.01(G) CERTIFICATE OF CONFERRAL

Counsel for Defendants conferred with counsel for Plaintiffs who represented that Plaintiffs object to the relief requested in this motion.


## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on November 1, 2018, the foregoing was electronically filed with the Clerk of Court by using the CM/ECF system which will also send a notice of electronic filing to all counsel of record.

/s/ *James Michael Walls*
James Michael Walls
Florida Bar No. 706272